**RAY EMMONS CONSTRUCTION CO., INC., Enoch R. Emmons, Inez V. Emmons, Plaintiffs,**

v.

**SOUTH CENTRAL BELL TELEPHONE COMPANY, Defendant.**

Civ. A. No. 75–2973.

United States District Court,
E. D. Louisiana.

April 10, 1981.

Kenneth L. Sanders and Sharon A. Perlis, Matairie, La., for plaintiffs.

Herschel L. Abbott, Jr., R. Patrick Vance and Ronald W. Tweedel, New Orleans, La., for defendant.

CASSIBRY, District Judge:

This is an action for damages in excess of four and one-half million dollars by plaintiff Ray Emmons Construction Co., Inc., [Emmons Company] against South Central Bell Telephone Company [South Central Bell] arising from alleged breach of contract, or alternatively quasi contract, and alleged delictual fault. Emmons Company, an independent contractor which did work exclusively for South Central Bell, contends that it suffered financial loss, and ultimately financial ruin in 1975, as a result of breach of oral promises as to quantity and

quality of work made to it by South Central Bell in connection with a written contract, and as a result of interference in its business by South Central Bell and the imposition by South Central Bell of improper policies in its operations.[1] The matter was tried on the merits to the court without a jury, and the court enters the following Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

1.

Plaintiff South Central Bell is a corporation incorporated under the laws of the State of Delaware and does business within Louisiana and other states.

2.

Ray Emmons Construction Co., Inc., is a Louisiana Corporation having its principal place of business in the Parish of Orleans. It was engaged in telephone construction work for South Central Bell from the time of its formation in March 1972 until its financial collapse in August 1975.

3.

Enoch R. Emmons, known as Ray Emmons, is President of Ray Emmons Construction Co., Inc., a major stockholder therein and a resident of Louisiana. He is experienced in performing telephone construction work, having been employed for approximately twenty years by Crescent Construction Company [Crescent], a company doing the major share of South Central Bell's construction work before 1973, and serving as its superintendent-supervisor when he terminated his position due to a personal difference with management. He is inexperienced in operating a telephone construction business.

4.

Inez V. Emmons, the wife of Ray Emmons, is a major stockholder in Ray Emmons Construction Co., Inc., is its secretary-treasurer, and is a resident of Louisiana.

5.

In 1971, while employed by Crescent, Ray Emmons formed Triangle Road Boring and Tunneling Company [Triangle] with Donald McMahon and A. J. Louke. He was president of this company and after he left Crescent, he devoted his full time to Triangle, and operated it successfully.

6.

In 1972 it was generally understood that in 1973 South Central Bell would be undertaking a $900 million dollar state-wide construction program, the largest telephone project ever to be undertaken in the state. The expansion program was tied to a rate increase. Crescent had done the major portion of South Central Bell's outside plant work through 1972, but it was not able to perform the volume of work that would be required. Finding sufficient qualified telephone construction companies was a prime consideration of South Central Bell.

7.

In his work with Triangle Ray Emmons had occasion to talk with Joseph G. Weddington, Division Construction Supervisor for defendant South Central Bell, whom he had known for years in connection with his work for Crescent, and to James Pitts, the defendant's General Plant Supervisor, about the expansion program and the need for qualified contractors. Joe Weddington regarded Ray Emmons as competent and well qualified in telephone construction work. They stimulated his interest in performing some of the work and encouraged him to apply for approval as a bidder on South Central Bell's construction work.

8.

After Emmons Company was formed in March 1972, James Pitts and Joseph Weddington wrote letters of recommendation on behalf of Ray Emmons and the company was placed on South Central Bell's ap-

---

1. The plaintiff contended initially also that defendant's failure to timely pay plaintiff for work performed under the terms of its contracts contributed to its financial ruin and made it liable therefor. By summary judgment this complaint was held to entitle plaintiff to interest only on the late payments, and that amount has been stipulated by the parties. The individual claims of Enoch R. Emmons and Inez V. Emmons as shareholders of Ray Emmons Construction Co., Inc., were dismissed earlier by summary judgment.

proved bidding list in June 1972. Emmons Company was awarded its first contract in November 1972. The operation of Triangle was handled by Donald McMahon, and Ray Emmons devoted his time completely to Emmons Company.

9.

South Central Bell commenced its massive expansion construction program in 1973. The work was done under master contracts applicable to districts and under individual contracts outside the master contracts. Customarily the types of work done under a master contract were burying service wire, poles and cable. Individual contract work consisted of conduit work and burying cable when the estimate for the job exceeded $25,000.00. The master contracts were awarded initially by the bid process. They could be continued after the expiration of their term by bid or by negotiation. The individual contracts could be awarded by mutual agreement to extend the master contract prices, by negotiation apart from the master contract, or by letting for bids.

10.

Until April 1974 Emmons Company had been awarded, after having successfully bid, only individual contracts for miscellaneous outside plant work in Orleans, Jefferson and St. Tammany Parishes. For the year ending April 30, 1974 its financial statement showed a net profit of $40,468.46.

11.

Crescent had internal problems in 1974 which did not permit it to continue the master contract it held for the Covington District. The District was then divided into two areas—one covered by the Covington Master Contract and one by the Hammond Master Contract. Both contracts were put out for bids at the same time. Four contractors were invited to bid for the Covington Master Contract. Three submitted bids, including Emmons Company, and Emmons Company was the successful bidder in April 1974. This moving into the master contract business required Emmons Company to obtain different types of equipment from that it had been using in the individual contract work, which had been mainly

conduit work. Emmons Company acquired in excess of $400,000.00 worth of trucks, machinery and other equipment in anticipation of the work which, together with the interest thereon, represented an investment of almost $600,000.00. In Ray Emmons' discussions with Joseph Weddington and Raymond McCluer, contract administrator for South Central Bell, before the bid was let or at the time of the signing of the contract, he was assured that Emmons Company would be approached first for negotiation of any individual contracts in the Covington Master Contract area. Emmons Company commenced work under the Covington Master Contract in May 1974.

12.

In September 1974 W. B. Stubbs, who had replaced Weddington as Division Construction Supervisor, approached Ray Emmons about taking over the Gentilly Master Contract for the Gentilly District in eastern New Orleans. Crescent held the contract and wished to withdraw from it because its lack of available manpower and equipment was keeping it behind the time schedules. Emmons Company was Stubbs' first choice for the job because of Ray Emmons' capability and his familiarity, from his previous work with Crescent, with the Gentilly area. Ray Emmons agreed to take over the Gentilly Master Contract and, to accommodate South Central Bell in the situation, he agreed to commence the work immediately at the Covington Master Contract rates for a period not to exceed 30 days. Some adjustments were made for overtime payment for the travel time of the employees from Covington, Louisiana to the Gentilly contract area. It was understood that the Covington rate schedule might prove to be inadequate for work in the Gentilly District because of the water table there and because of problems with the terrain, and that some of the Covington prices would likely have to be raised to a level which would assure Emmons Company a fair profit. Emmons Company commenced work in Gentilly within a week of the take-over agreement and thus solved the defendant's dilemma created by Crescent's withdrawal.

**13.**

Crescent's Master Contract had been an exclusive one, which meant that Crescent performed the master contract work to the exclusion of all others. Emmons Company undertook the Gentilly contract on a non-exclusive basis, that is, it had the right to select the jobs it would perform under the master contract, and South Central Bell could withhold any job from the master contractor. Emmons Company and South Central Bell signed the Gentilly Master Contract on October 18, 1974, in which the term was stated to begin on October 21, 1974 and to end on May 31, 1975. Price increases over the Covington Master Contract prices were reflected as to only four items.

**14.**

The only reasonable inference to be drawn from so few increases in prices over the Covington prices is that Ray Emmons did not realize fully at the time of the signing of the Gentilly contract the need for more or greater increases. He was apparently more concerned at this time about the delay by South Central Bell in payment of invoices submitted by Emmons Company. He did indicate to Stubbs at or about the time of the signing of the contract that he might want to request more increases after examining his books at the end of the year.

**15.**

As the Gentilly work progressed Ray Emmons realized that his company was losing money there. The company books, however, did not reflect any substantial Gentilly loss for 1974. Emmons Company had separate accounting books for its three operations—New Orleans, Gentilly and Covington. The failure of Emmons' office staff accurately to allocate the expenses of the New Orleans and Gentilly operations so that expenses properly Gentilly's were reflected as expenses of New Orleans, and the office staff's failure to transfer to Gentilly the expenses connected with the equipment moved from Covington to Gentilly caused the books to show a net profit of $20,000.00 for Gentilly in the operating statement for May 1, 1974 through October 31, 1974.

Some improvement in the allocation procedures was made after the October statement, but the operating statement for May 1, 1974 through December 31, 1974 showed an operating loss for Gentilly of only $1100.00. Emmons Company's certified public accountant John F. Winters realized, and made Ray Emmons aware, that the books at the end of 1974 did not reflect the true loss in Gentilly, but he terminated his services early in 1975 for non-payment for them before he could adjust the books to show the loss. In 1976, after this law suit was filed, Winters adjusted the books and concluded that the Gentilly loss was in excess of $60,000.00 for the time Emmons Company had the master contract there.

**16.**

Ray Emmons concluded that Emmons Company was losing $1,000 a day in Gentilly. He wrote a letter to Stubbs on January 20, 1975 to the effect that his loss for the fourth quarter of 1974 was in excess of $65,000, and requested an increase in the prices. Ray Emmons and Stubbs had a meeting that same day at which Ray Emmons emphasized that he needed price increases to continue in Gentilly. Although no specific requests were presented to Stubbs, he was willing to consider price increases.

**17.**

By January 31, 1975 when no action had been taken to increase the prices, Ray Emmons had become so concerned about the inadequate prices and resulting loss in Gentilly that he hand carried a letter to Stubbs' office giving 10-day notice of termination of the Gentilly contract pursuant to its cancellation clause. A meeting was held attended by Ray Emmons, Stubbs, Jules Lemoine, Superintendent for Emmons Company, and Leon Bolgiano, South Central Bell's Plant Manager of the Lake Division which included Gentilly. Lemoine had almost no participation, and Bolgiano was present for only a few minutes.

**18.**

Stubbs and Bolgiano were both displeased at the prospect of Ray Emmons leaving

Gentilly and urged him not to do so. His departure would have left South Central Bell in a worse bind and worse dilemma than Crescent's departure. Ray Emmons told them he did not want to leave Gentilly, but he could not continue at the low prices. Stubbs agreed to increase the prices, but told Ray Emmons he had to submit specific requests to work from. Ray Emmons had come to the meeting with no specific requests. Lemoine worked up the requests and submitted them within days. The requests were approved and made effective on February 24, 1975. The increases were substantial enough that Ray Emmons felt that he had prices which would produce a profit, and he was satisfied to continue the Gentilly Master Contract. On the termination date in May 1975, the contract was extended by agreement for 30 days, was then let for bids, and Emmons Company was not the successful bidder.

19.

Through 1974 all the individual contract work in the area covered by the Covington Master Contract was negotiated with Emmons Company by extending the master contract prices, except one which was bid. This work amounted to more than $600,-000.00.

20.

Transfers and other changes of personnel of South Central Bell, referred to as "decentralization", caused Weddington and McCluer to be removed from any responsibility for performance of the Covington and Gentilly contracts by the end of 1974. Thereafter Leon Bolgiano, General Plant Supervisor, Claude Elkins, General Plant Manager, and William B. Stubbs, Division Construction Supervisor, became the ones involved with the bidding and awarding of individual and master contracts in Covington and Gentilly. They were not advised by Weddington and McCluer of their assurances to Ray Emmons that Emmons Company would be the first approached for all individual contract work in the area covered by the Covington Master Contract for negotiation at master contract prices.

21.

Bolgiano preferred that the individual contracts be awarded by bidding. Six contracts were let out for bids in 1975 for work in the area covered by the Covington Master Contract. Emmons Company was the successful bidder on three. Emmons Company took over a fourth contract at master contract prices when the successful bidder withdrew from it. The other two contracts in June and July 1975 were bid successfully by companies other than Emmons Company.

22.

Ray Emmons made no complaint to South Central Bell when the contracts in his Covington area were let out for bids, or when he was the unsuccessful bidder, that the assurances to him were being breached. Contracts which were bid were usually more profitable to the contractor than those negotiated by extending the master contract prices.

23.

The total amount of contract work in Covington performed by Emmons Company—master contract and individual contract—for the year ending April 30, 1975 was $1,254,545.00.

24.

Certain policies of South Central Bell and problems that arose during the course of the work were irritants to Ray Emmons in his operation of Emmons Company, and he considers that they contributed to the failure of his business, namely:

1. The 30-day rule:

2. The "no-gratuity" policy;

3. Expectation of South Central Bell that Emmons Company would absorb its damage to underground facilities, such as pipelines and cables, even though they were not shown on plans provided by South Central Bell;

4. Requirement by South Central Bell that Emmons Company pay a sizeable damage claim before Emmons Company's insurer had processed the claim;

5. Interference by inexperienced foremen of South Central Bell in the performance of the work.

6. Cash-flow problem.

25.

South Central Bell initiated a policy prohibiting a contractor from hiring personnel from other contractors for a period of 30 days after leaving their prior employment. The principal beneficiary of the rule in the beginning was undoubtedly Crescent. South Central Bell wanted the new contractors to train their own personnel and build their own work force rather than induce the experienced personnel of others to work for them. Ray Emmons was made aware of this rule by South Central Bell at the time he formed Emmons Company. He did not agree with the rule in principle, and it was an irritant to him in the operation of his business. The rule was actually no impediment in the Covington work. Weddington relaxed the rule to give Ray Emmons permission to hire Crescent's men who remained in Covington after Crescent left. No punitive actions were taken by South Central Bell against any contractor for violation of the rule.

26.

South Central Bell invoked a "no-gratuity" policy, which prohibited contractors from offering gratuities to South Central Bell representatives in the form of entertainment, for the purpose of preventing contractors from vying for favorable treatment from their representatives. These gratuities had been made when Ray Emmons was employed by Crescent.

27.

A damage claim in the amount of $11,-000.00 was made during the performance of an individual contract on the west bank of the Mississippi River in the River Division when Emmons Company ruptured an existing water line. It was repaired by Boh Brothers Construction Co. for a charge of $11,000.00. Emmons Company made a claim to its insurer, but Boh Brothers wanted prompt payment and South Central Bell insisted that the claim be paid regardless of the fact that Emmons Company's claim to its insurer had not been processed. For the reason of non-payment of this claim and for Emmons Company's delay in certain surface restoration work, South Central Bell notified Emmons Company by letter dated January 24, 1975 that it would be excluded from invitations to bid in the River Division until these matters were attended to. It was notified that it had been restored to the bid list in the River Division on May 29, 1975. The evidence does not reveal when the payment was actually made to Boh Brothers, or when the insurer paid the claim to Emmons Company, or the jobs placed for bid in the River Division during the period that Emmons Company was excluded from invitation to bid.

28.

The instructions given by South Central Bell's foremen to Emmons Company's laborers as to how the work should be done was considered by Ray Emmons to delay the work and interfere with its progress because these foremen were inexperienced themselves.

29.

The cash flow problem became apparent within 60 to 90 days of commencement of work under the Covington Master Contract. South Central Bell in many instances delayed payment of Emmons Company invoices submitted to it beyond the 15-day period provided in the contracts. Emmons Company was constantly pushing South Central Bell for payment of the invoices. Materialmen and suppliers, who were not paid for credit extended, cut off credit and demanded immediate cash payment. Emmons Company became in arrears with its federal withholding and FICA taxes in September 1974, despite its accountants' advice stressing the importance of making these payments. In August 1975 the Department of Treasury, Internal Revenue Service, levied all of the accounts receivable held by Emmons Company, effectively putting it out of business.

THE ISSUES

Plaintiff Emmons Company contends that its financial failure was caused by (1)

the false promises made by South Central Bell to Ray Emmons to induce him to bid on the Covington Master Contract; (2) South Central Bell's coercion of Ray Emmons to continue the unfavorable Gentilly Master Contract under threat of losing other telephone business; (3) damaging policies imposed on Emmons Company by South Central Bell, and (4) interference in the business of Emmons Company by South Central Bell which damaged it. South Central Bell denies that it was responsible for the failure of Emmons Company.

## CONCLUSIONS OF LAW

### 1.

■ Emmons Company has not proved by a preponderance of the evidence that Ray Emmons was induced to bid on the Covington Master Contract by false promises made by Weddington and McCluer about the quantity and quality of work. The only specific conversation among Ray Emmons, Weddington and McCluer regarding the alleged amount of individual contract work promised took place after Emmons Company was the successful bidder. Estimates only had been given to Ray Emmons. A firm promise to Ray Emmons of $1,000,000.00 of work annually under the master contract and of 49 individual estimates having a total amount of $3,000,-000.00 each year for three years was not proved. Considering the fact that South Central Bell handed out at a general meeting of contractors in December 1973, attended by Ray Emmons, a document which contained an estimate of $2,041,000 for the independent contract work for 1974 in the Covington District, which included both the Covington and Hammond Master Contract areas, and that the Emmons Company actually had contract work in the Covington area for the period May 1, 1974 through April 30, 1975 of $1,254,545.00, it is unlikely that responsible company employees would have made the grossly exorbitant promise alleged by plaintiff. The contention that a promise was also made to Ray Emmons that Emmons Company as the contractor in the Covington Master Contract would be the first approached for individual contract work in the area covered by the Hammond Master Contract is not sustained by the evidence. Such a promise would have been inconsistent with South Central Bell's policy in 1974.

### 2.

The plaintiff's attempt to corroborate Ray Emmons' trial testimony that such promises were made by the fact that it acquired a large amount of equipment which lay idle is not successful. Emmons Company kept no inventory of equipment use. The evidence is conflicting as to whether Emmons Company ever had a substantial amount of idle equipment. According to plaintiff's argument as much as 70 per cent of its equipment was idle at times until the Gentilly work was begun. It is improbable that such a situation could have existed for the five months until the Emmons Company went into Gentilly without Ray Emmons complaining to Weddington and McCluer, if they had promised him the large amount of business he now claims.

### 3.

Furthermore, Ray Emmons' testimony in his deposition taken in September 1977 is consistent with his trial testimony as to the promised total amount of the individual contract work. In his deposition he testified that the best he could remember, he was told that the total amount of the forty-nine estimates was "somewhere around three million dollars." In the plaintiff's suggested Findings of Fact submitted in 1978 the 49 estimates are referred to as having a total of $3,000,000.00. The total amount of the 49 estimates was of such little significance to the plaintiff that it was not mentioned in the plaintiff's statement of material facts in the pre-trial order filed in October 1978. The defendant contends, and this contention is consistent with the record, that it was first made aware that Ray Emmons claimed that he was promised a total of $9,000,000.00 in individual contract work in Covington over a period of three years when he so testified on the trial of this case.

**4.**

Ray Emmons' deposition testimony cannot be disregarded as plaintiff vigorously contends. His physical and mental condition in September 1977 has not been shown to be so impaired that his testimony cannot be accepted. The deposition testimony of Ray Emmons' physician, Dr. Henry K. Threefoot, is not sufficient to have the court regard Ray Emmons as incompetent to testify at the taking of his deposition. He had been in a disoriented state in January 1977 from emotional and physical illness combined with the effects of an excessive use of Valium, but that condition is not evident as continuing into September from his responses to questioning at his deposition at that time.

**5.**

■ The change in policy by South Central Bell of awarding individual contract work by bid rather than by negotiation was a breach of the assurances given to Ray Emmons when Emmons Company obtained the Covington Master Contract. This was not a material breach, however, as evidenced by the fact that Ray Emmons never protested to South Central Bell that this change in policy deprived the Emmons Company of benefits promised to it in Covington. The change in policy was probably not material to Ray Emmons because the Emmons Company was invited to bid on the individual contracts in Covington, and contracts obtained by bid were usually more lucrative than those negotiated at master contract prices. The evidence does not permit any inference that the letting of individual contracts by bid rather than by extension of master contract prices was prompted by any intention of South Central Bell to damage the Emmons Company.

**6.**

■ The evidence does not sustain the contention that Ray Emmons was coerced by South Central Bell to continue in Gentilly under an unfavorable master contract. The extent of the Emmons Company's considerable losses in Gentilly were not fully realized by Ray Emmons until sometime in December 1974 or early January 1975 when the accountant clarified for him the operating losses for the various segments of the telephone work. An increase in prices in Gentilly immediately became an urgent matter, and when Stubbs did not respond promptly to his poorly prepared efforts to get an increase, he made known that he could not continue in Gentilly with the existing prices by submitting to Stubbs on January 31, 1975 the notice of termination letter. After Jules Lemoine submitted to Stubbs the Emmons Company's proposed price increases the prices were increased effective February 24, 1975 by agreement, and Ray Emmons was satisfied to continue in Gentilly.

**7.**

■ The evidence does not show with any preciseness the damage, if any, that the Emmons Company sustained from the 30-day rule, the "no gratuity" policy, and the interference by foremen in its business. They were at most irritants to Ray Emmons in the operation of his business. The court cannot conclude, however, that they contributed in any substantial way to the financial failure of the company.

**8.**

The complaint regarding the absorption by the Emmons Company of its damage to underground facilities is not a valid one. The master contracts under which the Emmons Company operated provided that it would absorb its damage to underground facilities. This absorption was not a mere expectation of South Central Bell. Article 17 of the master contract provided that damages by the contractor to overhead, surface and underground facilities, whether or not shown in work prints, drawings, etc. furnished by South Central Bell were the responsibility of the contractor. Moreover, the evidence does not show the amount of loss to the Emmons Company caused by its damage to underground facilities not shown on the drawings furnished by South Central Bell.

9.

The measures taken by South Central Bell to compel the payment of the $11,-000.00 claim of Boh Brothers for repairing the ruptured water line were no more oppressive or stringent than that allowed by the contract (Article 14 in master contracts and Article 16 in individual contracts) to deduct the amount of the claim from amounts owed to Emmons Company. The court cannot conclude under these circumstances that South Central Bell committed any fault in this instance that contributed to the financial failure of the defendant.

10.

■ The cash flow problem was a major cause of the financial difficulties of the Emmons Company, and the delay in payment by South Central Bell of the invoices submitted by Emmons Company substantially created the cash flow problem. These delays were caused by the accounting practices of the defendant and did not result from any malicious intent to damage the Emmons Company as it contends. It has previously been decided on a motion of South Central Bell for partial summary judgment that the damages owed for the delay in payment of money owed is interest for the period of delay. That amount in this case has been stipulated by the parties to be the sum of $19,624.38.

The Clerk shall enter judgment in favor of the plaintiff Emmons Company for interest due in the amount of $19,624.38, together with costs of this suit, and dismissing the suit as to all other claims of the plaintiffs Enoch R. Emmons, Inez Emmons and the Emmons Company.